FILED

May 19 2023, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Amanda O. Blackketter
Blackketter Law, LLC
Shelbyville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana
Indianapolis, Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tony Lawrence Richey,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 19, 2023

Court of Appeals Case No.
22A-CR-1107

Appeal from the Shelby Superior
Court

The Honorable R. Kent Apsley,
Judge

Trial Court Cause No.
73D01-2110-F4-020

**Opinion by Judge May**
Judges Weissmann and Foley concur.

**May, Judge.**

Tony Lawrence Richey appeals following his conviction of Level 4 felony possession of a firearm as a serious violent felon ("SVF").[1]  Richey raises three issues on appeal, which we revise, reorder, and restate as:

> 1.  Whether officers unconstitutionally seized Richey in violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, section 11 of the Indiana Constitution prior to discovering a firearm;

> 2.  Whether the State presented sufficient evidence that Richey had committed an SVF-qualifying offense; and

> 3.  Whether the trial court committed fundamental error when it admitted evidence of more than one of Richey's prior convictions.

We affirm.

## Facts and Procedural History[2]

On October 28, 2021, Deputy Justin Parker of the Shelby County Sheriff's Department was on duty in a marked police car when he received a dispatch regarding a suspicious person walking on a bridge over the Flat Rock River in rural Shelby County.  Deputy Parker responded to the call and found an individual camped underneath the bridge.  The individual told Deputy Parker

---

[1] Ind. Code § 35-47-4-5.

[2] We heard oral argument in this matter on April 4, 2023, in Indianapolis.  We commend counsel for their able presentations.

that he had not been walking on the bridge, but he packed up his camp and called a relative to pick him up. Deputy Parker's shift ended shortly thereafter, and he began driving back to his house. Deputy Parker passed Richey, who was walking on the road, during the drive back to his house. He did not recognize Richey, but the two exchanged waves.

[3] Deputy Parker arrived at his house and changed clothes. He then got in his personal vehicle to drive to an appointment in Greenwood. As Deputy Parker was driving to Greenwood, he saw Richey again. Deputy Parker stopped to speak with Richey, and he asked Richey where he was going. Richey said he was trying to get to Indianapolis. Deputy Parker thought this was unusual because Richey was not walking in the direction of Indianapolis, but Deputy Parker continued driving to his appointment in Greenwood. However, en route to the appointment, Deputy Parker found out the appointment was cancelled, and he decided to visit relatives who lived nearby. While visiting his relatives and approximately three-and-a-half hours after Deputy Parker first saw Richey, Deputy Parker saw Richey walking around again. Deputy Parker noted that, even though it was raining, Richey was not wearing rain gear. It was also near dusk, and Deputy Parker knew there were not any gas stations or restaurants nearby.

[4] Deputy Parker thought it would be best if a uniformed officer came to check on Richey. Deputy Parker then called Deputy Kenneth Thompson, another Shelby County Sheriff's deputy, and he continued to watch Richey as Richey walked into nearby woods. Deputy Thompson was on duty at the time, and

when Deputy Thompson arrived, he used his intercom to request anyone in the woods to come out. No one exited the woods, and Deputy Thompson left to respond to another call.

[5] Deputy Parker called Officer John Searle, an off-duty Shelbyville Police Officer, and told him about Richey. Deputy Parker then returned to visiting with his relatives. A short while later, Officer Searle saw Richey while Officer Searle was driving to a gas station to put gasoline in his patrol vehicle. Officer Searle noticed Richey was walking with the flow of traffic, and he initiated a stop of Richey. Officer Searle turned on his patrol car's red and blue lights, and he directed Richey to stand in front of the patrol vehicle. Officer Searle called Deputy Parker, and Deputy Parker arrived on the scene in his patrol vehicle with his red and blue lights activated. Deputy Parker asked Richey if he had been walking on the Flat Rock River bridge earlier in the day, and Richey indicated that he was walking around in that area. Richey was cooperative with the officers. He gave the officers varying answers regarding his intended destination, but he did acknowledge he would like a "courtesy ride."[3] (Tr. Vol.

---

[3] At trial, the State questioned Deputy Parker:

Q. Okay. What's a courtesy ride?

A. I mean, it, it's just that, it's a free taxi ride pretty much paid for by the tax payers, I guess. So, I mean, we do that multiple times, we get, we get people that, you know, walk from one place to another and sometimes they can be a hindrance, you know, a lot of people decide to walk on the interstate, which is illegal, we pick those people up instead

II at 66.) During this time, neither Officer Searle nor Deputy Parker handcuffed Richey or conducted a pat down search of Richey. They also did not put Richey in a patrol car. The officers never affirmatively told Richey that he was free to leave or that he was not free to leave.

[6] After speaking with Richey, the officers called Deputy Thompson and asked him to come to the scene to give Richey a courtesy ride. Deputy Thompson arrived approximately eleven minutes after Officer Searle stopped Richey. After speaking with the other officers on the scene, Deputy Thompson "just walked up to Mr. Richey and was like 'So, hey, man, you, you want a ride?' Like, 'Where you, where you wanna go?'" (*Id.* at 155.) Richey responded affirmatively and asked to be driven to Edinburgh. As Deputy Thompson and Richey were walking to Deputy Thompson's car, Deputy Thompson asked Richey if he had any weapons because Deputy Thompson always makes sure the individuals who accept courtesy rides from him are unarmed before getting into his vehicle for officer safety. Richey responded that he had a gun, so Deputy Thompson performed a pat down search of Richey. Deputy Thompson discovered a handgun and ammunition during the search and arrested Richey on suspicion of carrying a handgun without a license.

---

of ticketing them or something else and just get them to where they need to go and that way it, you know, one less thing we have to worry about.

(Tr. Vol. II at 67.)

[7] The next day, the State charged Richey with Level 4 felony unlawful possession of a firearm by an SVF. On March 8, 2022, Richey filed a motion to suppress the handgun and ammunition because the evidence was discovered during an illegal seizure. The trial court held a hearing on Richey's motion on March 16, 2022. On March 18, 2022, the trial court issued an order denying Richey's motion to suppress. The trial court found Officer Searle stopped and detained Richey when he encountered Richey walking on the wrong side of the road, but "[w]hat began as a brief detention became a consensual encounter with a couple of the neighbors who also happened to be police officers, until Deputy Thompson could arrive, which he did a short time later." (App. Vol. II at 81.)

[8] The trial court then held a jury trial beginning on March 22, 2022. Richey objected when the State offered the handgun and ammunition as evidence, and the trial court overruled the objection. The State also introduced certified court records from the Owen County Circuit Court that indicated "Tony Lawrence Richey," born August 30, 1972, was convicted on January 11, 1995, of eight total felony counts consisting of three counts of Class B felony burglary, three counts of Class C felony burglary, one count of Class C felony arson, and one count of Class D felony automobile theft, for crimes committed in 1994. (State's Ex. Vol. I at 21-29.) Stephen Cradick, the Owen County Sheriff from 1991 to 1999, testified that he was involved in the investigation of this offender in 1994, but he could not identify Richey as that offender at the time of Richey's trial because of the passage of time between the 1994 burglaries and the 2022 trial.

[9] The certified court records from Owen County also included the presentence investigation report ("PSI"), which described the offender's tattoos as: "Lion-Right. lower-arm, Skull-rht. upper arm, Heart-back, DG thumb, face on back, grim reaper on left arm." (*Id.* at 26) (errors in original). Lieutenant Shana Carrell, the assistant jail commander of the Shelby County Jail, testified that the jail took pictures of Richey's tattoos when he was booked into the jail in 2021, and Lieutenant Carrell took additional photographs of Richey's tattoos a few days prior to trial.[4] Lieutenant Carrell testified Richey had a skull tattooed on his right upper arm, a heart tattooed on his back, and a face on his back. Lieutenant Carrell explained Richey's arms were heavily tattooed, and it was possible some of the tattoos Richey had on his arm in past years were covered by subsequent tattoos. The trial court also required Richey to show his bare arms and upper back to the jury. In addition, the State introduced a recorded call Richey made from the Shelby County Jail in which he said, "I own up to what I did wrong" and referenced "a case that I had in Owen County." (State's Ex. 15 at approx. 11:47.)

[10] The jury found Richey guilty as charged. On April 26, 2022, the trial court sentenced Richey to a term of seven years. The trial court ordered Richey to serve the first six years of his sentence incarcerated in the Indiana Department

---

[4] During oral argument, Richey's counsel acknowledged some of the photographs of Richey's tattoos included in the appellate record are not legible, but she stated she believed the photographs shown to the jury were able to be seen clearly. Moreover, the jury was able to personally observe Richey's tattoos.

of Correction, and the trial court suspended the final year of Richey's sentence to probation.

# Discussion and Decision

## 1. Constitutionality of Search

Richey argues the officers lacked the requisite reasonable suspicion to initiate a *Terry*[5] stop and detained him longer than necessary to effectuate the purpose of the stop. He contends, based thereon, that the gun and ammunition should not have been admitted at trial because they were obtained following an unconstitutional seizure. Thus, Richey appeals the admission of the evidence at trial. *See Washington v. State*, 784 N.E.2d 584, 586-87 (Ind. Ct. App. 2003) (explaining issue is appropriately framed as challenge to admission of evidence at trial when defendant objected at trial and appeals from a completed trial, even though defendant filed a pre-trial motion to suppress).

Generally, we review a trial court's decision on the admission of evidence for an abuse of discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. "A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law." *Id*. However, the constitutionality of a search or seizure is a matter of law that we review de novo. *Holloway v. State*, 69 N.E.3d 924, 929

---

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1869 (1968).

(Ind. Ct. App. 2017), *trans. denied*. When making such a determination, we "consider the foundational evidence from the trial as well as the evidence from the motion to suppress hearing which is not in direct conflict with the trial testimony." *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

### 1.1 Officer Searle's Terry stop of Richey

### 1.1.1 Fourth Amendment

[13] The Fourth Amendment to the United Stated Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The Amendment protects citizens from search or seizure absent a warrant supported by probable cause." *Tigner v. State*, 142 N.E.3d 1064, 1068 (Ind. Ct. App. 2020). However, there are several exceptions to the warrant requirement, and the State bears the burden of proving at trial that one of those exceptions applies before it may admit evidence collected during a warrantless seizure. *Id*.

[14] One exception to the warrant requirement is the so-called *Terry* stop, which is "a brief investigatory stop falling short of traditional arrest." *Clark v. State*, 994 N.E.2d 252, 263 (Ind. 2013). Such a stop "permits an officer to stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot[,] even if the

officer lacks probable cause." *Id.* (internal quotation marks omitted). The reasonable suspicion requirement is satisfied when "the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur." *Crabtree v. State*, 762 N.E.2d 241, 246 (Ind. Ct. App. 2002). It "entails something more than an inchoate and unparticularized suspicion or hunch but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* "[A] set of individually innocent facts, when observed in conjunction, can be sufficient to create reasonable suspicion of criminal activity." *Finger v. State*, 799 N.E.2d 528, 534 (Ind. 2003). "What constitutes reasonable suspicion is determined on a case-by-case basis, and the totality of the circumstances is considered." *Polson v. State*, 49 N.E.3d 186, 190 (Ind. Ct. App. 2015). We must strike a balance between the interests of public safety and an individual's right to be free of arbitrary law enforcement interference. *Id.*

[15] Richey asserts Officer Searle lacked reasonable suspicion to initiate a *Terry* stop of him. However, police officers may initiate a stop when they observe even a minor traffic violation, *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006), and Officer Searle observed Richey walking on the wrong side of the road, which is a Class C infraction. *See* Ind. Code § 9-21-17-14 ("If neither a sidewalk nor a shoulder is available, a pedestrian walking along and upon a highway shall walk as near as practicable to an outside edge of the roadway. If the roadway is two-way, the pedestrian shall walk only on the left side of the roadway.") &

Ind. Code § 9-21-17-24 ("A person who violates this chapter commits a Class C infraction."). Thus, Officer Searle possessed the requisite reasonable suspicion to initiate a stop.[6] *See Meredith v. State*, 906 N.E.2d 867, 873 (Ind. 2009) (holding officer had reasonable suspicion of a traffic violation to pull over the defendant's vehicle).

### 1.1.2 Indiana Constitution

While the language of Article 1, Section 11 of the Indiana Constitution mirrors the Fourth Amendment, we interpret Article 1, Section 11 independently. *Hardin v. State*, 148 N.E.3d 932, 941 (Ind. 2020), *cert. denied*, 141 S. Ct. 2468 (2021). Under the Indiana Constitution, we assess the reasonableness of a search or seizure by looking at the totality of the circumstances. *Id*. While other considerations may impact our analysis, we balance three factors when examining the reasonableness of a search or seizure: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion

---

[6] In *Neeley v. State*, we held the officers' stop of Neeley was unlawful even though Neeley was walking on the wrong side of the road. 70 N.E.3d 866, 873 (Ind. Ct. App. 2017). We noted "none of the officers ever informed Neeley that he had been stopped for walking on the wrong side of the road" and one officer testified it "'wasn't a real big deal[.]'" *Id*. Richey likens his case to *Neeley* because "none of the officers spoke to Richey about walking on the wrong side of the road…[and] Officer Searle testified that he has never ticketed anyone for that infraction, and he was not going to ticket Richey for it." (Appellant's Br. at 17-18.) We acknowledge the stop of Richey bears several similarities to the stop in *Neeley*. However, well-established Fourth Amendment precedent from both the United States Supreme Court and our Indiana Supreme Court allows police officers to initiate a traffic stop upon observation of a traffic violation. *See*, *e.g.*, *Whren v. U.S.*, 517 U.S. 806, 819, 116 S. Ct. 1769, 1777 (1996) (holding traffic stop was reasonable under the Fourth Amendment when officers had probable cause to believe the defendant violated the traffic code); *State v. Keck*, 4 N.E.3d 1180, 1184 (Ind. 2014) ("If an officer observes a driver commit a traffic violation, he has probable cause—and thus also the lesser included reasonable suspicion—to stop that driver."). Moreover, Deputy Parker observed Richey wandering in the rain for several hours without rain gear, and the sun had set by the time Officer Searle stopped Richey. Thus, the stop was also motivated by a concern for Richey's safety.

the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[17] Officer Searle had a high degree of knowledge Richey committed a traffic violation based on his personal observation of Richey walking on the road with the flow of traffic. In addition, Officer Searle had knowledge Richey might be lost or otherwise in need of assistance. Moreover, the initial stop was a small intrusion on Richey's normal activities, and "law enforcement has at least a legitimate, if not a compelling, need to enforce traffic-safety laws[.]" *Marshall v. State*, 117 N.E.3d 1254, 1262 (Ind. 2019), *cert. denied*, 140 S. Ct. 113 (2019). Therefore, we hold Officer Searle's stop of Richey did not violate Richey's rights under the Indiana Constitution. *See id.* (holding traffic stop for speeding did not violate the defendant's rights under the Indiana Constitution).

### 2.2 Duration of the Terry stop and Deputy Thompson's search of Richey

### 2.2.1. Fourth Amendment

[18] Richey next argues that, even if Officer Searle's initial stop of him was lawful, the stop became unconstitutional when officers held him at the scene longer than necessary. A police officer violates the Fourth Amendment's shield against unreasonable seizure when the officer holds someone beyond the time needed to handle the matter for which the stop was made. *Rodriguez v. U.S.*, 575 U.S. 348, 350, 135 S. Ct. 1609, 1612 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should

have been—completed." *Id.* at 1614. However, a consensual encounter does not implicate the Fourth Amendment. *Powell v. State*, 912 N.E.2d 853, 859 (Ind. Ct. App. 2009).

[19] The Fourth Amendment is triggered only "when there is a show of authority such that a reasonable person would have believed he was not free to leave." *State v. Scott*, 966 N.E.2d 85, 88 (Ind. Ct. App. 2012), *trans. denied*. "The test for whether such a reasonable impression existed is what a reasonable person, innocent of any crime, would have thought had he been in the citizen's shoes." *Id.* at 89. The test "is necessarily imprecise" and "is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Id.* Factors that may indicate to a reasonable person that the person is not free to leave include: "(1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) the physical touching of the person, or (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *State v. Augustine*, 851 N.E.2d 1022, 1026 (Ind. Ct. App. 2006).

[20] Richey notes Deputy Parker arrived approximately nine minutes after Officer Searle stopped Richey, and Deputy Thompson arrived nearly eleven minutes after the stop. During this time, Richey stood in front of Officer Searle's police vehicle. Richey leaned on the hood of Officer Searle's vehicle, and both Deputy Parker and Officer Searle activated their red and blue police lights. Richey contends all these facts indicate he was not free to leave.

[21]     However, neither Officer Searle nor Deputy Parker handcuffed Richey. They also did not display any weapons or search Richey. The officers never grabbed Richey or threatened him. *Contra Neeley v. State*, 70 N.E.3d 866, 874 (Ind. Ct. App. 2017) (holding *Terry* stop progressed to unlawful seizure when officers physically restrained the defendant for thirteen minutes and threatened him with injury and arrest). Richey gave varying answers regarding his intended destination, but he never expressed an unwillingness to accept a ride. Officer Searle testified that, during the encounter: "I think I said something like, you know, another officer is on his way and [Richey] just stayed." (Tr. Vol. II at 137.) Because neither Officer Searle nor Deputy Parker was on duty, they wanted to wait for Deputy Thompson to arrive to give Richey a courtesy ride. Deputy Thompson simply asked Richey "'So, hey, man, you, you want a ride?' Like, 'Where you, where you wanna go?'" (*Id*. at 155.) He did not demand Richey get into his vehicle, and Deputy Thompson testified that for officer safety he always asks someone if the person has a weapon before giving the person a courtesy ride. A reasonable person in Richey's position would have felt free to decline the offer of a courtesy ride or to express a desire to continue traveling on foot, but Richey did neither. Therefore, Richey's Fourth Amendment right against unreasonable search and seizure was not violated because the initial *Terry* stop of Richey turned into a consensual encounter before the officers discovered the handgun on Richey. *See McLain v. State*, 963 N.E.2d 662, 667 (Ind. Ct. App. 2012) (holding search of defendant's vehicle was part of a consensual encounter and did not implicate the defendant's Fourth Amendment rights when the search occurred after officer's traffic stop of

defendant had concluded), *trans. denied*. While Deputy Thompson did search Richey after Richey disclosed he possessed a handgun, such a search was necessary to ensure Deputy Thompson's safety. *See N.W. v. State*, 834 N.E.2d 159, 166 (Ind. Ct. App. 2005) (holding pat down search of juvenile due to concern for officer safety did not violate Fourth Amendment), *trans denied*.

### 1.2.2 Indiana Constitution

Richey also argues the duration of the stop violated his rights under the Indiana Constitution because he "had been stopped by police for twelve minutes before the firearm was discovered" and "there was no justifiable law enforcement need to detain Richey for 12 minutes." (Appellant's Br. at 22.) Indiana Code section 34-28-5-3 provides that whenever a law enforcement officer believes in good faith that a person committed a traffic violation, the officer may detain the person for a time sufficient to inform the person of the allegation, obtain the person's identification information, and allow the person to execute a notice to appear. Moreover, in *Quirk*, our Indiana Supreme Court held evidence found by officers during a search of the defendant's vehicle must be suppressed because the officers' continued detention of the defendant after issuing a warning ticket was unreasonable under the Indiana Constitution. 842 N.E.2d at 343.

However, as we explained above, Officer Searle's *Terry* stop of Richey turned into a consensual encounter prior to Deputy Thompson's discovery of the firearm. Richey was free to decline the offer of a courtesy ride and continue walking. However, he chose to accept the offer, and Richey voluntarily

disclosed he had a gun when Deputy Thompson asked whether he had any weapons. *See Powell*, 912 N.E.2d at 863 (holding consensual encounter did not violate the defendant's rights under Article 1, Section 11 of the Indiana Constitution). Once Richey disclosed that he had a firearm, Deputy Thompson had a significant need to search Richey for weapons to ensure Deputy Thompson's safety during the courtesy ride, and Deputy Thompson's pat down search of Richey was minimally intrusive. Richey's possession of the gun also raised concern and suspicion regarding whether he could legally possess a firearm. Because Officer Searle's *Terry* stop of Richey turned into a consensual encounter before the discovery of the firearm and Deputy Thompson's search of Richey after Richey disclosed he had a handgun was reasonable, the officers did not violate Richey's rights under Article 1, Section 11 of the Indiana Constitution. *See Triblet v. State*, 169 N.E.2d 430, 437 (Ind. Ct. App. 2021) (holding pat down search for weapons to ensure officer safety was reasonable under the Indiana Constitution), *trans. denied*.

## 2. Sufficiency of the Evidence

[24] Richey also asserts "the State's limited identity evidence for the 1994 burglary offender was insufficient to prove beyond a reasonable doubt that Richey was that offender, and his conviction must be reversed." (Appellant's Br. at 9.) We apply a well-settled standard of review when evaluating claims of insufficient evidence:

> Sufficiency-of-the-evidence claims . . . warrant a deferential
> standard, in which we neither reweigh the evidence nor judge

witness credibility.  Rather, we consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence.  We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt.

*Powell v. State*, 151 N.E.3d 256, 262-63 (Ind. 2020) (internal citations omitted).

[25] "The State must prove every element of the crime charged beyond a reasonable doubt." *Willis v. State*, 983 N.E.2d 670, 672 (Ind. Ct. App. 2013).  The statute defining unlawful possession of a firearm by an SVF provides that someone convicted of one of several listed felonies, including burglary as a Class A or Class B felony if committed before July 1, 2014, is an SVF.  Ind. Code § 35-47-4-5(b)(16)(A).  An SVF who knowingly or intentionally possesses a firearm commits a Level 4 felony.  Ind. Code § 35-47-4-5(c).

[26] Richey argues the State failed to present sufficient evidence of his identity to prove he was the 1994 burglary offender.  In *Payne v. State*, we held the State did not present sufficient evidence the defendant committed a previous violent felony when "the only evidence the State introduced to prove Payne's identity as the defendant in the robbery cause was the evidence of the robbery defendant's name and birth date."  96 N.E.3d 606, 613 (Ind. Ct. App. 2018), *trans. denied*.  Likewise, in *Woodward v. State*, 187 N.E.3d 311, 322 (Ind. Ct. App. 2022), *reh'g denied*, we held the State failed to present sufficient evidence that the defendant, Zachary Woodward, was an SVF because, while the State presented evidence that an individual named Zachary Woodward was

convicted of dealing in a controlled substance in 2008, "the State did not introduce evidence of the defendant Woodward's social security number nor any other evidence linking defendant Woodward to the previous conviction." *Id*. at 320. Richey likens his case to *Woodward* and notes the State did not present photographs or fingerprints of the 1994 offender, evidence of that offender's social security number, or witness testimony identifying Richey as the 1994 offender.

[27] Yet, in *Hernandez v. State*, our Indiana Supreme Court explained:

> Certified copies of judgments or commitments containing a defendant's name or a similar name may be introduced to prove the commission of prior felonies. While there must be supporting evidence to identify the defendant as the person named in the documents, the evidence may be circumstantial. If the evidence yields logical and reasonable inferences from which the finder of fact may determine beyond a reasonable doubt that it was a defendant who was convicted of the prior felony, then a sufficient connection has been shown.

716 N.E.2d 948, 953 (Ind. 1999) (internal citations omitted), *reh'g denied*.

[28] Sheriff Cradick investigated the 1994 burglaries and testified that "Tony Lawrence Richey" had been convicted of perpetrating the burglaries. (Tr. Vol. II at 211.) The charging information, plea agreement, and abstract of judgment from the case stemming from those burglaries included an offender with the same name and date of birth as Richey. Moreover, the State presented the PSI, which included additional details regarding the offender like his height, race, hair color, and eye color. All these details matched Richey. The PSI also

described the tattoos of the offender who committed the 1994 burglaries, and the State presented evidence of the tattoos on Richey's body at the time of trial. Lieutenant Carrell testified that some of the tattoos on Richey's body at the time of trial matched the descriptions listed in the PSI for the offender who committed the 1994 burglary. In addition, the State introduced into evidence a jail telephone call in which Richey referenced an Owen County case. Richey argues this evidence is not sufficient to prove he was the offender convicted of Class B felony burglary in 1995 because tattoos can be added, removed, or modified over time and Richey's reference to an Owen County case could mean a case other than the 1994 burglaries. However, these arguments are simply invitations for us to reweigh the evidence, which our standard of review precludes. *See Walker v. State*, 678 N.E.2d 402, 404 (Ind. Ct. App. 1997) ("Walker's argument is substantially an invitation to reweigh the evidence and reexamine the victim's credibility as a witness, which our standard of review precludes us from accepting."). A reasonable finder of fact could weigh the matching name, date of birth, and physical characteristics described in the Owen County Court records, the tattoos, and Richey's statement during the jail call to mean Richey was the offender convicted of Class B felony burglary in the Owen County case. *See Oster v. State*, 992 N.E.2d 871, 878 (Ind. Ct. App. 2013) (holding the State presented sufficient evidence of the defendant's identity to support a habitual offender finding when the defendant's parole officer testified that despite a slight name difference, the defendant was the person referred to in previous court records), *trans. denied*.

## 3. Admission of Prior Convictions

[29] Lastly, Richey argues the trial court committed fundamental error when it admitted evidence of more than one of Richey's prior convictions. As explained above, we generally review a trial court's decision on the admission of evidence for an abuse of discretion. *Mack*, 23 N.E.3d at 750. However, if a party fails to object to admission of the challenged evidence before the trial court, the issue is waived for appeal unless the admission constitutes fundamental error. *Mendenhall v. State*, 963 N.E.2d 553, 567 (Ind. Ct. App. 2012), *trans. denied*. "The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id*. This exception is available only in "egregious circumstances," when the claimed error either makes a fair trial impossible or constitutes a clearly blatant violation of basic and elementary principles of due process. *Id*. "The mere fact that error occurred and that it was prejudicial will not satisfy the fundamental error rule." *Purifoy v. State*, 821 N.E.2d 409, 412 (Ind. Ct. App. 2005), *trans. denied*. To constitute fundamental error, a defendant must show greater prejudice than ordinary reversible error. *Id*. Richey failed to object at trial to the evidence he now challenges and thus he must demonstrate fundamental error.

[30] Indiana Rule of Evidence 404(b) provides: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. Rule 404(b) "is designed to prevent the jury from making the 'forbidden inference' that prior wrongful conduct suggests present guilt." *Byers v. State*, 709 N.E.2d 1024, 1026-27 (Ind. 1999) (quoting *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998)). "Simply stated, evidence is inadmissible under Indiana Evidence Rule 404(b) when its only apparent purpose is to prove that the defendant is a person who commits crime." *Wilson v. State*, 931 N.E.2d 914, 919-20 (Ind. Ct. App. 2010), *trans. denied*. Nonetheless, if relevant, "evidence of other crimes may be admissible for purposes other than to show the defendant's character or propensity to commit the crime charged." *Id*. at 920.

[31] Here, the State offered and the trial court admitted evidence that on January 11, 1995, Richey was convicted of three counts of Class B felony burglary, three counts of Class C felony burglary, one count of Class C felony arson, and one count of Class D felony automobile theft. This evidence included copies of the charging information, an abstract of judgment, and documents associated with Richey's plea agreement. Richey contends the only prior conviction with any relevance to the instant case "was one conviction for burglary as a Class B felony which was necessary to prove the SVF element." (Appellant's Br. at 24.) He asserts admission of the additional convictions amounts to fundamental error.

[32] To obtain a conviction, the State was required to prove both that Richey possessed a firearm and that he was an SVF. *See* Ind. Code § 35-47-4-5. Overwhelming evidence demonstrates Richey possessed a handgun. Richey admitted he had a gun before getting into Deputy Thompson's car, and Deputy Thompson found a handgun in Richey's waistband immediately thereafter. Both Deputy Parker and Officer Searle saw the handgun at the scene, and in a subsequent jail phone call, Richey stated, "they caught me with a weapon." (St. Ex. 8 at 3:06.)

[33] With respect to Richey's SVF-status, the State was required to prove Richey was convicted of one count of Class B felony burglary in 1995. Therefore, the State needed to present evidence that (1) a trial court entered judgment of conviction for a serious violent felony prior to the date of Richey's possession of a handgun in the instant case and (2) that judgment of conviction was entered against Richey. The abstract of judgment indicated the Owen Circuit Court entered a judgment of conviction for Class B felony burglary against "Tony Richey" on January 11, 1995. (State's Ex. Vol. I at 24.) The charging information, joint motion to enter guilty plea, and PSI from that case provided additional details regarding the offender and those details matched Richey.

[34] The concern here, though, is not that the certified court documents from Owen County were admitted at all, but rather that the documents disclosed seven other felony convictions beyond the one conviction the State needed to prove its

case.[7] The disclosure of these additional felony convictions was error. *See*, *e.g.*, *Baker v. State*, 997 N.E.2d 67, 73 (Ind. Ct. App. 2013) (holding it was error for the trial court to admit evidence of defendant's prior bad acts but error was nonetheless harmless).

[35] However, Rule 404(b) "is designed to prevent the jury from making the 'forbidden inference' that prior wrongful conduct suggests present guilt." *Laird v. State*, 103 N.E.3d 1171, 1176 (Ind. Ct. App. 2018), *trans. denied*. "The effect of Rule 404(b) is that evidence is excluded only when it is introduced to prove the forbidden inference of demonstrating the defendant's propensity to commit the charged crime." *Id*. at 1777. It is not disputed that Richey possessed a handgun as he approached Deputy Thompson's vehicle, and therefore, there is no danger that the jury drew an inference that Richey committed the charged possession offense merely because Richey committed criminal acts in the past.

[36] The Owen County court documents were introduced to prove Richey was the individual convicted of Class B felony burglary in Owen Circuit Court on January 11, 1995. Once the jury concluded Richey was that individual, the

---

[7] We note this issue could have been avoided had the State presented the charging information for only one count of Class B felony burglary and redacted references to Richey's additional convictions from the abstract of judgment, PSI, and plea agreement documents it introduced from the Owen County case. See, e.g., *Wilson*, 931 N.E.2d at 920 ("Initially, we observe that any unrelated character evidence contained in Wilson's BMV record should have been redacted from Wilson's record before it was admitted at trial.") Likewise, it would have been better practice for Richey to have objected to admission of the documents in unredacted form or for the trial court to have sua sponte ordered redaction in light of the well-established rule "that evidence of a defendant's prior criminal history is highly prejudicial and should not be admitted." *Null v. State*, 690 N.E.2d 758, 762 (Ind. Ct. App. 1998).

State had succeeded in proving Richey's SVF-status. Whether Richey was convicted of any additional offenses, and what those offenses might have been, was immaterial. The number of convictions in 1995 would not make a jury more or less likely to find Richey was the Tony Lawrence Richey convicted in 1995. Thus, the fact that the jury learned Tony Lawrence Richey was convicted of multiple other felonies in 1995 does not constitute fundamental error.[8] *See Warren v. State*, 182 N.E.3d 925, 934 (Ind. Ct. App. 2022) (holding officer's testimony that he initially believed brown substance found in defendant's house was heroin constituted harmless error because "we are satisfied that there is no substantial likelihood that the challenged evidence contributed to the jury's verdict").

[37] Richey also argues fundamental error occurred because, despite an agreement among the parties not to include the term "serious violent felon" in the trial court's reading of the charging information when instructing the jury, the term was nonetheless included. (Appellant's Br. at 26.) We have recommended that trial courts "reference the predicate felony as one 'enumerated under [Indiana Code section] 35-47-4-5' rather than as a 'serious violent felony.'" *Spearman v. State*, 744 N.E.2d 545, 550 n.8 (Ind. Ct. App. 2001), *reh'g denied*, *trans. denied*.

---

[8] Richey also asserts the trial court committed fundamental error when it "admitted the charging information with some details regarding all three prior Class B felony burglaries." (Appellant's Br. at 27.) However, Richey fails to explain how the disclosure of these details denied him a fair trial, and we decline to hold that disclosure of these minimal details constituted fundamental error. *See Halliburton v. State*, 1 N.E.3d 670, 683 n.7 (Ind. 2013) (noting defendant failed to show how introduction of character evidence amounted to fundamental error).

However, the State did not emphasize the facts of the underlying burglaries, and the trial court used the SVF term a limited number of times. The trial court also instructed the jury regarding the presumption of innocence and the State's burden to prove Richey guilty beyond a reasonable doubt. Therefore, the trial court's limited use of the term did not amount to fundamental error. *See Ray v. State*, 846 N.E.2d 1064, 1070 (Ind. Ct. App. 2006) (holding trial court's error in instructing the jury that the defendant had a prior robbery conviction during prosecution for being an SVF in possession of a handgun was harmless), *trans. denied*.

# Conclusion

[38] Officer Searle lawfully stopped Richey upon observing a traffic violation, and the *Terry* stop turned into a consensual encounter before Deputy Thompson discovered the handgun. The State presented sufficient evidence that Richey committed an SVF qualifying offense because Richey's name, date of birth, physical characteristics, and tattoos matched those of an offender convicted in 1995 of Class B felony burglary in Owen County. In addition, the trial court did not commit fundamental error when it admitted evidence of Richey's other felony convictions in 1995. For these reasons, we affirm the trial court.

[39] Affirmed.

Weissmann, J., and Foley, J., concur.